IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 09-CV-01006-MSK-BNB

JOHN STEPHEN HEANEY,

      Plaintiff,

v.

DETECTIVE JAMES COSTIGAN,
DETECTIVE MICHAEL CORDOVA,
DETECTIVE NOEL IKEDA,
SERGEANT DANIEL STEELE; and
THE CITY AND COUNTY OF DENVER, COLORADO,

      Defendants.

---

## PLAINTIFF'S RESPONSE
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

      Plaintiff John Heaney, through undersigned counsel, hereby opposes Defendant's motion for summary judgment (# 75). Triable issues of fact exist with regard to all claims upon which Defendant's seek summary judgment.

## CONFERRAL STATEMENT

      As Defendants noted in their Motion for Summary Judgment (Docket 75), counsel for all parties conferred at length regarding Plaintiff's claims for relief. Plaintiff agreed to dismiss several claims and parties.[1] Plaintiff has since urged Defendants to narrow down their claims for summary judgment to those where a good faith absence of genuine material fact may be alleged.

---

[1] Defendants note in their Motion for Summary Judgment

1

Defendants have refused to withdraw any claims for summary judgment, and affirm that so that only those where Defendants had a good faith over, Defendants were unwilling to either remove, or later withdraw any claims for summary judgment, despite the existence of clear genuine disputes of material fact regarding

## EXHIBIT INDEX

Please see the Exhibit Index at the bottom of this document for exhibit citation.

## INTRODUCTION

Every story has two sides. Defendants' account has left out an alarming amount of factual dispute between the parties. In particular, Defendants have left out the existence of four independent witnesses, which largely support Plaintiff's account of the incident. Thus, this case is about circumstances that are interpreted by the four Defendants' one way, and Plaintiff, the video, and four independent witnesses another way.

On April 4, 2008, it is undisputed that Defendants' were engaged in an undercover sting operation to cite ticket scalpers outside of Coors field on opening day. Defendants were in plain clothes designed to blend in as ordinary Rockies fans. Plaintiff Mr. Heaney was then a 58 year old man who was on his way to put his mother into hospice care. Mr. Heaney rode his bicycle through the intersection with pedestrian traffic. The cross-street, Blake St. had been closed due to the heavy pedestrian traffic on opening day. Mr. Heaney did not run a red light, but rode his bike diagonally across the intersection. Mr. Heaney does not remember bumping into anyone, but Cordova believed that Mr. Heaney bumped into him as Mr. Heaney rode past him. This made Cordova angry. Cordova believed that Mr. Heaney had assaulted him by bumping into him. Although Cordova says he did not intend to arrest Mr. Heaney, he yelled at him in order to get an

apology or acknowledgement from Mr. Heaney. Cordova yelled profanities to Mr. Heaney. This made Mr. Heaney curious that someone thought he had done something that he did not. Mr. Heaney turned around toward Cordova, and stopped his bike about 6-10 feet away from Cordova. Mr. Heaney stood there straddling his bike. At that point, Cordova and Costigan advanced toward him. Mr. Heaney remembers that Cordova looked menacing. However, he did not believe anyone would attack him out in the open, in broad daylight.

Mr. Heaney became scared as the men approached him. Cordova got into Mr. Heaney's face. At that point, Mr. Heaney thought the men wanted to harm him. In an act of self-defense, Mr. Heaney moved his left hand in an upward, open-handed, motion to try to flip the hat off of Cordova to create some space between them, so that Mr. Heaney could try to get away. During the process of that attempt, the two men punched and fiercely grabbed Mr. Heaney. The two men ripped Mr. Heaney from his bicycle and threw him on the ground. Mr. Heaney immediately landed on his hands and knees, stunned. The two men pummeled Mr. Heaney with punches, kicks, and knees to the head and face. Cordova appeared to "go off" on Mr. Heaney, repeatedly punching him in the head. Mr. Heaney remained dazed from the attack and offered no resistance. At one point, a third party witness, Mr. Prinkey came in to try to stop the assault, but the officers identified themselves as officers and told him to get back. This was the first time that the officers had identified themselves as police officers at any time. Later, a police officer, in full uniform arrived. Officer Palmatier and the two undercover officers rolled Mr. Heaney onto his back. Cordova wrapped his arms around Mr. Heaney's neck and choked Mr. Heaney in a dangerous carotid hold. The officers then rolled Mr. Heaney onto his stomach and brought his hands behind his back. Just before the officers handcuff Mr. Heaney, the officers yelled "stop resisting," as if it

was a rallying cry, and Officer Cordova immediately grabbed Heaney by his ponytail, raised his head, and then smashed it into the pavement. The witnesses described the sound of Mr. Heaney's teeth smashing into the pavement as something unmistakable and shocking. Cordova's head slam broke Mr. Heaney's two front teeth.

## CLAIMS AND DEFENSES UPON WHICH JUDGMENT IS SOUGHT

### A. EXCESSIVE FORCE

1. Burden of proof

Plaintiff agrees with Defendants' recitation of the burden of proof insofar as it correctly identifies that Plaintiff is required to show prima facie evidence that creates material issues of genuine factual dispute regarding each element of excessive force. As the nonmoving party, Plaintiff's factual allegations should be construed in favor of the Plaintiff for the purposes of Defendants' motion for summary judgment.

2. Elements challenged by Defendants

Defendants appear to broadly challenge Plaintiff's assertion that (1) the officers use of force was objectively unreasonable and that Officers Cordova and Costigan violated Heaney's Fourth Amendment rights. (2) Cordova and Costigan violated clearly established law.

3. Element 1

a.      There is an abundance of evidence to show that the officers use of force was unreasonable and excessive in violation of Mr. Heaney's Fourth Amendment right to freedom from unreasonable seizure, including statements made by John Heaney, statements made by four independent witnesses, and the video that captured most of the incident.

The police did not have legal justification to: (1) attack Mr. Heaney at the beginning of the altercation, (2) continue pummeling Mr. Heaney while Mr. Heaney was on the ground, (3) strike Mr. Heaney in the head as opposed to using lesser forms of force such as holds, pressure points or even body strikes, (4) place Mr. Heaney in a life-threatening carotid hold, (5) to smash Mr. Heaney's head into the pavement when the officers had Mr. Heaney on his stomach, with his hands behind his back, or (6) to pull Heaney's hair upward while pushing all Cordova's body weight into Heaney's neck.

b.      The standard for "excessive force" in violation of the Fourth Amendment, in the 10th Circuit, is whether force used by officers was objectively unreasonable in light of the facts and circumstances confronting them. *Graham v. Connor,* 490 U.S. 386, 397 (1989). The evaluation is highly fact-dependent. Use of force is analyzed under the *Graham* factors, which includes but is not limited to considering (a) the severity of the crime at issue, (b) whether the suspect poses an immediate threat to officers or others, and (c) whether the suspect is actively resisting or attempting to evade the arrest by flight. *Id.* In addition, the 10th Circuit considers the degree of force used in determining whether or not an officer was unreasonable. *Newell v. Salina,* 276 F.Supp.2d 1148, 1153 (D. Kans. 2003) (Citing *Rucker v. Hampton,* 49 Fed. Appx. 806, 809 (10th Cir. 2002). The

degree of force is critical in analyzing questions of excessive force if lesser force that may have gained compliance is not used in place of greater force. *See Casey v. City of Federal Heights,* 509 F.3d 1278, 1286 (10th Cir. 2007). Generally, force is unreasonable if it is in excess of that required to effectuate an arrest. However, in this case we are confronted with the undercover officers, who under Plaintiff's version of the facts failed to identify themselves, and who never instructed plaintiff that he was under arrest.  The 10th Circuit allows consideration of questions related to  "whether [the officers'] own reckless or deliberate conduct during the seizure unreasonably created the need to use force.' *Medina v. Cram,* 252 F.3d 1124 (10th Cir. 2001) (quoting *Sevier v. City of Lawrence,* 60 F.3d 695, 699 (10th Cir.1995)). Thus, the undercover nature of the officers' acts should be factored in to trigger a cautious, least-use-of-force approach, because being undercover is to purposefully conceal the color of authority that an officer normally has in a *Graham*, excessive force, analysis.

    c.    ***The Graham and 10th Circuit use-of-force factors show that the officers use of force was objectively unreasonable.***

    (1)    On April 4, 2008, it is undisputed that officers Ikeda, Costigan, and Cordova were engaged in an undercover sting operation to cite ticket scalpers outside of Coors field on opening day of a Rockies baseball game. Docket 75 at 2; *Exhibit 1, Ikeda PH Hearing Transcript,* p. 4 ll 9-15. The officers were in plain clothes that were designed to fool ticket scalpers into illegally selling the undercover officers tickets. *Id.* The officers were wearing jeans and Rockies jerseys. *Exhibit 2, John Heaney's*

*testimony during Cordova's criminal,* at 234 ll 7-14. In this attire, the undercover officers looked like criminal types, or thugs. *Id.* The officers did not identify themselves as police officers until after they began pummeling Mr. Heaney. *Id.* at 236 ll 2-10; *Exhibit 6* at 180 ll 6-21; *Exhibit 3, Renee Herlocker's testimony during Cordova's criminal trial,* at 203; *Exhibit 4, Greg Prinkey Affidavit* at 2; *Exhibit 5, Jason Jewett Affidavit* at 2. There is no indication in the record, either from the third party witnesses or the officers, themselves, that the officers ever told Mr. Heaney that he was under arrest. This, in and of itself creates a triable issue of material fact as to whether Heaney should have known at any time that he should have complied with the officers' orders. However, despite this lack of knowledge, Mr. Heaney did not offer resistance at any time. Officer Cordova recklessly created the force-situation by approaching Heaney in an aggressive manner, without identifying himself as a police officer. *See Exhibit 6, Heaney's deposition at 165 ll 7-14, 167 ll 7-12, 170 ll 9-19, 171 ll 15-24, 175 ll 7-19, 177 ll 5-19; 180 ll 6-21. See also Exhibit 4*, 1-3; *Exhibit 5*, 1-3.

(2) Mr. Heaney was not a threat to the officers or bystanders. Mr. Heaney did not commit a violent crime for which the officers pursued him. Mr. Heaney did not approach the undercover men. Mr. Heaney turned his bike around toward the officers out of curiosity, after one of the undercover men yelled profanities at him. Exhibit 2, at 180 ll 4-9; 24-25. But Mr. Heaney stopped short of reaching the man. Exhibit 6, Heaney Deposition at 169 ll 18-25. Mr. Heaney stood still, straddling his bike while the aggressive-looking man approached Mr. Heaney from 6-10 feet away. *Id.* at 169 ll 15-17. Exhibit 2 at 233 ll 12-25. Cordova was the aggressor, yelling at Mr. Heaney in

explatives *Exhibit 6* at 167. *Exhibit 2, Heaney's testimony at Cordova's criminal trial,* at 180. Cordova apparently wanted an apology or an acknowledgement from Mr. Heaney, because Cordova believed that Mr. Heaney had bumped into him earlier. Exhibit 7, Deposition of Cordova at 111-112 ll 10-25; 1-2. Officer Cordova admitted to being angry that someone had bumped into him earlier. *Id.* at 99 ll 18-22. Mr. Heaney, at no time, attempted to strike or resist the officers. *Exhibit 2* at 185 ll 6-20, 240 ll 14-25. Exhibit 6 at 145 ll 7-14. Mr. Heaney *attempted* to flip the hat off of one of the men to create space and to escape, in self-defense from the angry looking man. *Exhibit 2* at 183 ll 6-24, 184 ll 1-14. The maneuver Mr. Heaney used was one that would not easily have been mistaken for a punch. Mr. Heaney used an open-handed lift of his hand that was pointed upward, while maintaining a bent elbow. *Exhibit 6* at 171-172 ll 16-25; 1-9. This description is significantly different from a closed, outstretched fist, wildly flung, which is what the officers described. *See Exhibit 15, Costigan Motions Hearing testimony* at 64:1-18. It is monumentally different from the boxing match of exchanged punches that Officer Cordova described. 2 *Exhibit 14, Cordova PH Hearing Testimony, at* 46:21-47:19. The maneuver was so subtle that the independent witnesses did not see it. The independent witnesses did not see Heaney make any aggressive move toward the officers other than lean toward them. *Exhibit 8, Prinkey testimony at Cordova's Criminal Trial* at 213 ll 7-25, *Exhibit* 4 at 2-3. *Exhibit 5* at 2-3. The officers struck Mr. Heaney multiple times with kicks, punches, elbows,

2 Cordova is trying to justify the Cordova's later punches after Heaney was taken off his bike and taken to the ground by conflating that period with the period when Heaney allegedly punched Cordova, which would justify punching by Cordova.  This is a basic defense strategy in this case.

8

knees and rolls, inflicting such harm that Mr. Heaney had trouble even breathing. *Exhibit 2* at 187 ll 6-19. The officers had complete control of Mr. Heaney. *Exhibit 10* at 146 ll 6-22; *Exhibit 4* at 2, *Exhibit 5* at 2. There was never any indication from the third party witnesses that Mr. Heaney reached out to strike either of the officers at any time.

(3) The severity of the crime at issue was minor. Allegedly, Mr. Heaney ran a red light on his bicycle and bumped Cordova along the way. *Exhibit 7* at 82-83 ll 11-25; 1-21. After Cordova aggressively confronted Mr. Heaney, while Mr. Heaney was straddling his bicycle, Mr. Heaney defensively attempted to flip Cordova's hat off his head in an attempt to create enough space to get away from two aggressive looking men. Although Defendants contend that Mr. Heaney punched Cordova, Mr. Heaney is insistent that he did not punch Cordova at any time, and that officer Cordova, along with his fellow officers, have made up that allegation to justify the force that was excessively used against him. *Exhibit 6* at 145 ll 3-12, 137-138 ll 22-25; 1-6. Several of the witnesses observed the police approach Mr. Heaney at the time that the officers allege that Mr. Heaney punched the officers. Greg Prinkey, Jason Jewett, and Nick Heckman each agree that Mr. Heaney did not punch either of the officers at the time they alleged, or at any time. *Id.; Exhibit 10* at 139-140 ll 3-25; 1-24; *Exhibit 4* at 2;-3 *Exhibit 5* at 2-3.

(4) Mr. Heaney did not try to resist or evade police. Mr. Heaney did not even know he was dealing with police until he was too dazed from being pummeled in the head to recognize the import of that fact. *Exhibit 6* at 181-182 ll 2-25; 1-8. It is

impossible to resist arrest from officers who have never told you they were police, nor that you were under arrest. Mr. Heaney did not resist the men who attacked him, either at the time they attacked him, nor after the men announced they were officers. Greg Prinkey, Renee Herlocker, and Jason Jewett agree that Mr. Heaney did not attempt to resist the officers. *Exhibit 3* at 202 ll 3-10, 204 ll 1-21; *Exhibit 8* at 122, 133; Exhibit 4 at 2; Exhibit 5 at 2. The video shows that Mr. Heaney did not resist the officers. *See Defendant's Exhibit II, Schott Video, Fourth Segment.*

d.   ***Defendants' allegations of undisputed fact are incorrect and misleading***

Defendants' allege that there is no genuine issue of material fact that Heaney was not the initial aggressor. (Docket 75 at 14). However, Mr. Heaney, and each of three independent witnesses all describe that the undercover men walked toward Heaney and ripped him from his bicycle. *Exhibit 6* at 177 ll 9-19; *Exhibit 9* at 29 ll 19-21, 31 ll 2-15. *Exhibit 11, Testimony of Jason Jewett at Cordova's Trial* at 113 -114 ll 23-25; 1-25. *Exhibit 4* at 2. *Exhibit 5* at 2. In each of the witness's accounts, there was no provocation by Mr. Heaney.

Defendants' allege Mr. Heaney admitted to resisting officers when he stated during deposition that he had taken so many hits that he wasn't thinking or reacting properly, in response to a question that asked why he didn't just go limp. (Docket 75 at 11). In arguing that this was an admission by Mr. Heaney, Defendants blatantly misrepresented the testimony that Mr. Heaney gave. Mr. Heaney has stated time and time again that he was dazed and semi-conscious after the officers first struck him in

the head. *Exhibit 2* at 173 ll 16-20, 187 ll 3-5; *Exhibit 6* at 178 ll 9-16. Mr. Heaney became even further dazed as the officers continued to pummel him from what seemed like every direction *Id.* at 177-179. Mr. Heaney was stunned; he felt like he was losing consciousness from the pummeling. Mr. Heaney felt spacey and as if things were in slow motion. Exhibit 2 at 196:8-25. But Mr. Heaney absolutely did not resist the men at any time. *Id.*

Defendants' allege that Mr. Heaney admits to getting up on his hands and knees after Mr. Heaney was taken to the ground. (Docket 75 at 15). But Mr. Heaney never admitted to such an allegation. Mr. Heaney is clear throughout his testimony that although his memory is vague and perhaps mixed up, he believes he was taken from the bike directly to his hands and knees on the ground. *Id.* at 187. Mr. Heaney and the independent witnesses concur that Mr. Heaney was ripped from the bike and thrown onto the ground into the hands-and-knees position. Exhibit 10 at 139. Exhibit 4 at 2. Exhibit 5 at 2. Nick Heckman described that the motion was natural and seemed instinctual; as the officers threw Heaney onto the ground, he fell and braced himself on his hands and knees. *Exhibit 10, Nick Heckman's testimony during Cordova's criminal trial,* at 155-156. Once Mr. Heaney was moved from his hands and knees by the officers, Mr. Heaney never returned to that position. Exhibit 10 at 152. In fact, the witnesses and the videotape supports that Mr. Heaney's movement was completely controlled by the officers.  Exhibit 4 at 2. Exhibit 5 at 2; See also Defendants' Exhibit II, Schott video, Fourth Segment.

One of the few undisputed facts Plaintiff acknowledges about his conduct was that Mr. Heaney *attempted* to flip the hat off of Cordova's head. However, Mr. Heaney did not do this to an officer who had identified himself, he did this to an aggressive man who approached him in a menacing manner, because Mr. Heaney did not feel he could escape without doing so. Mr. Heaney used a bent elbow, open-handed lift of his hand, in an upward motion, that would be difficult to confuse with a punch from the perspective of a reasonable trained police officer. When the officers engaged in multiple successive uses of force afterward, the officers did not give Mr. Heaney lawful commands that Mr. Heaney had time or ability to follow in Mr. Heaney's dazed state.

**e.** ***The six separate instances of force used by the officers were unreasonable under the circumstances and violated Mr. Heaney's Fourth Amendment Right to be free from unreasonable seizure in the totality of circumstances.***

The undercover officers looked like thugs, and approached Mr. Heaney to get an apology from him. Mr. Heaney did believed that Cordova meant business. Exhibit 2 at 183. Mr. Heaney described that Cordova looked menacing, and that Cordova purposefully got in his face. *Id.* This is consistent with Cordova's admission that he was angry. A reasonable officer under the circumstances would have known that he had disguised himself to look like a ticket scalper, and that if he wanted to initiate contact with a civilian he should have clearly identified himself as a police officer – particularly while angry. The independent witnesses all agree that they never heard the officers yell that they were police officers until Greg Prinkey, and Officer Palmatier attempted to break up the attack. Exhibit 4 at 3. Exhibit 5 at 3. Mr. Heaney attempted

to flip Cordova's hat off in order to escape an aggressive thug from a crowd, not to attack a police officer.

Mr. Heaney's attempt to flip the hat off of Cordova was a quick, open handed, flip gesture, using his left hand. It was not a punch. Mr. Heaney's elbow remained bent and his left hand was used in a fleeting upward motion – not in a forceful, extended, swinging motion as the officers describe.

However, even if a fact-finder were to come to the conclusion that such a gesture could reasonably cause Costigan to believe Cordova was punched, officers Cordova and Costigan went far beyond the force necessary to effectuate an arrest for that offense. After the officers ripped Mr. Heaney from his bike, and threw Mr. Heaney onto the ground (*first use of excessive force*), the witnesses saw Officer Cordova "go off" on Mr. Heaney, pummeling him numerous times. Exhibit 4 at 2 (*second use of excessive force*). The officers struck Mr. Heaney repeatedly while Mr. Heaney was on his hands and knees, where Mr. Heaney stayed dazed and semi-conscious. Mr. Heaney took the pummeling while offering no affirmative resistance. The officers chose to pummel Mr. Heaney *in the head* as opposed to using lesser forms of force, such as arm-bars, body holds, and pressure points to effectuate an arrest (*third use of excessive force*). More importantly, the officers elected to use these greater forms of force instead of issuing commands that Heaney might have had the time and opportunity to follow if simply given a chance. The constant strikes to Mr. Heaney's head caused Mr. Heaney to be dazed and reasonably unresponsive to anything but basic self-preservation as he braced himself on all fours. Exhibit 8 at 129-130.

Cordova used a life-threatening carotid hold maneuver to stop the air and blood flow from pulsing through Mr. Heaney's neck (fourth use of excessive force). See Video. The carotid hold maneuver, also called a cardio-vascular restraint, is so dangerous that it should only be used in life-threatening situations. *See Exhibit 13, Willard's Supplemental Expert Report* at 3. Mr. Heaney felt like he could not breath while Cordova had his arm around Heaney's neck. Exhibit 6 at 185-186. Finally, Cordova grabbed Mr. Heaney's face and slammed it into the ground, well after (by any reasonable account) the officers had Mr. Heaney completely under control (fifth use of excessive force). Exhibit 3 at 92. Exhibit 8 at 133. Exhibit 11 at 115. Exhibit 10 at 140. See also Defendants' Exhibit II, Schott video, Fourth Segment. The witnesses describe the unmistakable sound of teeth hitting cement that can be heard on the video. Exhibit 10 at 147; Defendants' Exhibit II, Schott video, Fourth Segment. Nick Heckman's graphs, authenticated and admitted as evidence during Cordova's criminal trial clearly show the pain and anguish on Mr. Heaney's face as Cordova pulled his hair up while driving his knee down into Mr. Heaney's neck. See Exhibit 10, 142-143: 1-25; Exhibit 25, photographs 1-4. A fact finder has sufficient evidence to find that each of these uses of force were excessive.

Plaintiff has presented sufficient evidence to reasonably find that even if Mr. Heaney's movement toward Cordova could be seen as aggressive, that Cordova and Costigan crossed the line of reasonableness by "go[ing] off" on Heaney. After the dust settled, and Mr. Heaney's hands were behind his back, a jury could easily determine that officer Cordova unnecessarily slammed Mr. Heaney's head in the ground to cause

injury. There is at least a dispute of material fact sufficient for a fact-finder to reach a different conclusion than Defendants as to whether the officers used excessive force under these highly contested circumstances.

4.     <u>Element 3.</u>

Defendants are not entitled to qualified immunity because there is more than sufficient case law by the Supreme Court and the 10th Circuit to put Defendants' on notice that their use of excessive force would be in violation of the law. Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law as plaintiff maintains. However, the 10th Circuit has explained why we need not conduct a scavenger hunt for prior cases with exactly the same facts:

> Because excessive force jurisprudence requires an all-things-considered inquiry, with careful attention to the facts and circumstances of each case, there will almost never be a previously published opinion involving exactly the same circumstances. We cannot find immunity wherever there is a new fact pattern.

*Casey v. City of Federal Heights,* 509 F.3d 1278, 1284 (10th Cir. 2007)
(*citing Anderson v Blake,* 469 F.3d 910, 914) (10th Cir. 2006)).

Thus, a general constitutional rule can apply with obvious clarity to the specific conduct in question even though such conduct has not previously been held unlawful. *Id.* The more egregious an officers use of force is, in light of prevailing constitutional principles, the less specificity is required from prior cases. *Id.* In

*Holland ex rel. Overdorff v. Harrington,* 268 F.3d 1179, 1193 (10th Cir. 2001), sheriffs held children directly at gunpoint after the officers had gained complete control of the situation. There, because there were no substantial grounds for a reasonable officer to conclude that there was legitimate justification for his conduct, the officers were not entitled to qualified immunity. The case at bar has similar circumstances to Plaintiff's theory of the case – Officer Cordova and Officer Costigan where in control of the situation. There were no substantial grounds to believe that there was legitimate justification for the force used at each of the six junctures where excessive force was applied. Even if at one point the officers may have had justification to use some level of force (from there perspective) a reasonable officer would not have had substantial grounds where Mr. Heaney was not fighting back and was not resisting. *Graham* establishes that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest. 490 U.S. at 396. Substantial grounds must justify each and every application of force. In this case, there were not substantial grounds. For each of the six instances of applied force.


**B.  FAILURE TO INTERVENE**

    1.  <u>Burden of proof</u>

Plaintiff agrees with Defendants' recitation of the burden of proof insofar as it correctly identifies that Plaintiff is required to show prima facie factual evidence that creates genuine issues of material dispute regarding each element of Failure to Intervene.

As the nonmoving party, Plaintiff's factual allegations should be construed in favor of the Plaintiff for the purposes of Defendants' motion for summary judgment.

### 2.  Elements challenged by Defendant

Defendants' appear to broadly challenge every element of Plaintiff's claim, including that (1) unreasonable force was used, (2) Ikeda witness or had the opportunity to witness the use of force, and (3) Ikeda had a realistic opportunity to intervene.

### 3.  Element 1

The amount of force used by officers Costigan and Cordova was objectively unreasonable under the totality of the circumstances. As a result, the force used was excessive. See facts alleged in section A. Excessive Force.

### 4.  Element 2

a.      In the 10th Circuit, a law enforcement officer may be held liable for his failure to intervene, if he is present for the excessive force of another officer, but fails in his affirmative constitutional duty to prevent the use of force. *Casey v. City of Federal Heights,* 509 F.3d 1278, 1283 (10th Cir. 2007). This is particularly true if the officer watched the incident but did not thing to prevent it. *Id. (quoting Mick v. Brewer* 76 F.3d 1127, 1136 (10th Cir. 1996)).

b.      Although Defendant is correct that Ikeda did not participate in the use of force against Mr. Heaney, Defendant is incorrect that Ikeda did not witness the use of force against him, or have the opportunity to intervene. Detective Ikeda is observable on the video, in a purple and black Rockies jersey, intently watching the undercover officers

pummel Heaney for almost the entirety of the video. *See Defendants' Exhibit II, Schott Video, Fourth Segment.* Detective Ikeda stands over the beating, within feet of his trainees. *Id.* Detective Ikeda is not moving his head side to side or giving any visible indication that he is not watching the fight other than when he steps away for a brief moment. During the preliminary hearing for criminal charges filed against Mr. Heaney, Ikeda affirmed that "with [his] own eyes and [his] own ears [he] witnessed an event involving John Heaney." Exhibit 1 at 4. This leads to a dispute of genuine material fact regarding whether or not Ikeda saw enough to give him indication that there was or would likely be excessive force, and whether Ikeda failed in his duty to stop it.

     5. <u>Element 3.</u>

     In order to establish a claim for failure to intervene, Plaintiff must establish that an officer had a reasonable opportunity to intervene. While Ikeda says that he was scanning the area for scalpers, and may very well have some theory about how he was doing that without moving his head from side to side, in his mind, he was clearly in a position to observe the excessive force and to stop it, while he faced the altercation. At a minimum, Ikeda says that he saw the beginning of the altercation. D MSJ at 34, and he saw Costigan contact Heaney when Heaney was on his hands and knees. *Id.* A jury deserves to make its own inferences about whether Ikeda really observed the beating that occurred right in front of him and whether he should have stepped in to intervene.

     Moreover, there is sufficient evidence to allow a reasonable fact-finder to determine that whether or not Ikeda watched at key moments that excessive force was used, Ikeda was close enough that even if he was not watching, he should have been

observing his trainee officers. Supervisors have a higher degree of supervisory responsibility, with regard to their affirmative duty to intervene to stop excessive force. *Fogarty v. Gallegos,* 523 F.3d 1147, 1163-1164 (10th Cir. 2008). They also have a greater opportunity to use their authority to stop excessive force of their subordinates. Thus, Ikeda should have intervened to stop the excessive used of force.

## C. **MONELL CLAIM FOR UNCONSTITUTIONAL POLICY OR PRACTICE**

### 1. Burden of proof

Plaintiff agrees with Defendants' recitation of the burden of proof insofar as it correctly identifies that Plaintiff is required to show prima facie evidence that creates genuine issues of material factual dispute regarding each element of an unconstitutional custom or policy, or lack thereof. As the nonmoving party, Plaintiff's factual allegations should be construed in favor of the Plaintiff for the purposes of Defendants' motion for summary judgment.

### 2. Elements challenged by Defendant

Defendants' challenge all necessary elements that comprise a Monell claim under a theory of unconstitutional custom, practice or police, including Plaintiff's assertion that (1) there was an underlying constitutional violation by one of the City's employees or officers, (2) there is a longstanding policy or custom that is responsible for the

deprivation of Mr. Heaney's Constitutional rights, (3) there is a direct causal link

between the municipal policy or custom and Mr. Heaney's injuries, and (4) there has

been deliberate indifference to Mr. Heaney constitutional rights.


3. <u>Element 1</u>

The amount of force used by officers Costigan and Cordova was objectively

unreasonable under the totality of the circumstances. As a result, the force used was

excessive. See facts alleged in section A. Excessive Force.


4. <u>Elements 2 and 3</u>

Plaintiff acknowledges that to sufficiently allege the existence of a municipal

policy which violated federal law under which Defendant City and County of Denver

may be held liable, the Plaintiff must point to a policy, statement, ordinance, regulation,

or decision officially adopted or promulgated by the municipality. *See generally Monell*

*v. Department of Social Services,* 98 S.C.t 2018 (1977).

The City and County of Denver's formal pain compliance policy has lead to the

deprivation of Plaintiff's Fourth Amendment right to be free from unreasonable seizure.

The city's pain compliance policy describes that if a suspect does not comply with

an officers directions, the officer may respond by using closed fists or baton strikes in

order to induce pain. *See exhibit 12 at 1, Pain Compliance Policy, marked confidential,*

*filed under seal.*

The policy then lists "types of resistance by a suspect" which describes how an officer may encounter civilians exercising non-compliance that the officer may use to then apply pain compliance techniques. These "types of resistance" include:

> Psychological intimidation (verbal cues in attitude, demeanor, posture)
> Verbal non-compliance (verbal unwillingness to cooperate)
> Passive resistance (physical action such as a person who remains in a limp or prone position). *Id.* at 2.

The use of pain compliance techniques including the use of fists and batons is excessive when officers do not have a substantial justification to use that high level of physical force or when a lower level of force would exact compliance (See above Section A. Excessive Force). This policy is inconsistent with the demands of the Constitution. The policy authorizes the officers to use physical force such as fist and baton strikes at the first indication that someone does not like or want to cooperate with the officer. The policy encourages just the kind of disproportionate "shoot now and ask questions later" force that the 10th Circuit has disapproved of for individual officers in other circumstances. See *Casey v. City of Federal Heights*, 509 F.3d 1278, 1285-1286 (10th Cir. 2007).

Not only may a lower level of force such as command presence, pressure points, or leverage techniques be useful in appropriately and proportionately responding to a subject expressing the types of "resistance" listed above, but a lower level of force should be required where a subject does not have the time or the ability to respond to commands, such as when a subject is unconscious or unable to comply. The absurdity of the policy may be illustrated by the fact that if a person is beaten to death, the very fact that the

person "goes limp" or remains "prone" authorizes the officers to use pain compliance; to continuing beating the person.

In the case before us, Mr. Heaney testifies that he was completely dazed when the officers' immediately leapt to the use of force. In particular, Heaney seemed to go in and out of consciousness while the officers pummeled him in the head. Mr. Heaney clearly lost some ability to think straight. Whether the officers gave him legal commands or not, Mr. Heaney could not reasonably have complied. Mr. Heaney sustained repeated head injuries, which left him in a state of shock, and Mr. Heaney stunned on all fours. Mr. Heaney testified that even when he was in a moment of consciousness, and the officers asked him to give him his arm, Mr. Heaney wanted nothing more than to give him his arm, but he couldn't, it was pinned. Exhibit 2 187-188 ll 6-25; 1-12.

The pain compliance policy encourages officers to use force if they perceive that someone is merely in a prone position, or failing to abide by commands such as to give the officers an arm even while it is pinned underneath him. The officers testify several times that they used "pain compliance" to try to get Mr. Heaney to the ground on his stomach, from being on his hands and knees. Exhibit 7 at 217 ll 4-6; Exhibit 20 at 77 ll 4-7. This is despite the fact that Mr. Heaney could not reasonably have been expected to comply at various times – after he was hit in the head by a barrage of fists designed to "distract" him. The video shows that if there is any shred of truth to the argument that Mr. Heaney was "resisting" it was within the context of this defensive, prone resistance, where he was instinctually frozen and could not think straight to be capable of following

commands. Yet the policy authorized the police to use force again and again until the altercation was over.

At a minimum, there are sufficient disputed material facts for this question to reach a fact-finder. A jury should be entitled to review the policy and its effects to determine if the policy was a moving force behind the excessive force violation, or whether the officers caused the excessive force independent of the policy.

Element 4

Plaintiff acknowledges that deliberate indifference by a municipality may be satisfied where a violation of federal rights is highly predictable or plainly obvious. *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998). The City and County of Denver's policy regarding pain compliance leads to exactly the kind of results that are plainly obvious – where officers are likely to use excessive force even though it is not required or authorized by the constitution, in cases where subjects may be dazed by earlier blows to the head and unable to comply with commands .


**D. UNCONSTITUTIONAL FAILURE TO TRAIN**

1. Burden of proof

Plaintiff agrees with Defendants' recitation of the burden of proof insofar as it correctly identifies that Plaintiff is required to show prima facie evidence that creates genuine issues of material factual dispute regarding each element of a *Monell* claim for Unconstitutional failure to Train. As the nonmoving party, Plaintiff's factual allegations should be construed in favor of the Plaintiff for the purposes of Defendants' motion for summary judgment.

2. <u>Elements challenged by Defendant</u>

Defendants' appear to broadly challenge all necessary elements of the Failure to train theory, including Plaintiff's assertion that (1) there was an underlying constitutional violation (2) the training of the officers was inadequate and (3) there is evidence of deliberate indifference.

3. <u>Element 1</u>

Officers Costigan, Cordova and Steele lied in their use of force reports about the level of force and resistance Mr. Heaney used against them. These knowing, false and misleading statements and related omissions form the basis for the malicious prosecution without probable cause to believe that Mr. Heaney had committed second-degree assault against a police officer and criminal mischief.

4. <u>Element 2</u>

Individual liability of the supervisors Ikeda and Steele is based on Ikeda's direct participation by failing to intervene as a field training officer which allowed him to exercise of control and direction over the trainees, as well as Ikeda and Steele's failure to supervise the trainees and ratification of the trainee's actions.

Individual liability under 42 U.S.C. § 1983 must be based on the individual's personal participation in the alleged constitutional deprivation. See *Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir.1976); *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir.1996). To hold a supervisor of a tortfeasor liable under § 1983, the plaintiff must show that "an 'affirmative link' exists between the [constitutional] deprivation and either the supervisor's personal participation,

his exercise of control or direction, or his failure to supervise.' " *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir.1997)(quoting Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir.1988)(internal citation omitted)); see, also, Harrington, 268 F.3d at 1187 (citing Meade). An individual supervisor "who takes an active part in continuing or procuring the continuation of criminal proceedings initiated by himself or by another is subject to the same liability for malicious prosecution as if he had then initiated the proceedings." Pierce, 359 F.3d at 1292 (quoting Restatement (Second) of Torts § 655 (1977)).

Ikeda was a supervisory detective training new vice/narcotics detectives in the field. Exhibit 1, 14:7.

Defendants' expert designated in this case, and former police trainer, Michael O'neill claims that the police officer were appropriately trained. However, he stated that their training did not include any guidance prohibiting the officers from conferring with other officers before writing a report concerning the use of force of a suspect. See Exhibit 22, Deposition of Michael O'Neill, at 251-252. Officer Cordova had no trouble admitting that he discussed the use of force incident with other officers including Officer Steele, Officer Ikeda, and Officer Costigan before or in preparation of his own report. Exhibit 7 at 167-168 ll 22-24;1-18. Exhibit 7 at 175-176 ll 10-25; 1-25.

When officers discuss their reports with other officers, and the use of force that was involved, it is unlikely that there will be any *independent* account of the use of force by the officers. Admittedly, this type of communication problem may ordinarily just be an administrative concern that would not lead to a constitutional violation. However, if an officer lies about the use of force with his or her fellow officers, and that account then becomes part of the report(s), a lack of training prohibiting the officers from conferring about what happened is likely a moving force behind a malicious prosecution in violation of Plaintiff's rights. Ultimately it is easier to conceal lies or misstatements by encouraging other officers to include the misrepresentations in their reports, because multiple reports gives the illusion that misstatements or lies are more credible. The absence of a policy puts subjects in greater jeopardy of being railroaded by false statements shared by multiple officers. This is precisely what Mr. Heaney is alleging here: the officers discussed what they should put in their use of force reports to frame Mr. Heaney, in an effort to illegitimately justify their own use of excessive force.

Element 3

A police department is deliberately indifferent to the Constitutional rights of suspects when the "need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the City can be said to have been deliberately indifferent to the need. *Brown,* 227 F.3d at 1288-89, *See generally Canton v. Harris,* 489 U.S. 378 (1989).

The municipal police department is aware that officers lie or make misstatements in their use of force reports regarding their own use of force and suspect's level of force. The City and County of Denver knows that the police department is a brotherhood of individuals who are best friends, who have biases favoring their fellow police officers to such an extent that they might be willing to cover for each other. There is a strong likelihood that lies that are shared amongst officers may turn into statements in use of force reports that will be used to frame a suspect. Given this knowledge, the City and County of Denver should train its officers not to confer about their use of force reports before submitting them to superiors. The City and County of Denver is deliberately indifferent by not training its officers to refrain from conferring about the use of force before writing individual reports concerning the use of force, which may become evidence in a criminal trial against a suspect.

In this case, the absence of training or instruction designed to require officers to write only for themselves created an environment where lies communicated by Officer Cordova gained artificial substantiation, leading to the unnecessary and malicious prosecution of Mr. Heaney.

### E.  Malicious Prosecution[3]

1.    <u>Burden of Proof</u>

---

[3] As stated by defense, counsel for the parties did confer and agreed that Plaintiff would indicate in this Response the agreed upon position with respect to the federal False Arrest and Malicious Prosecution and Common Law False Arrest and Imprisonment Claims.  Plaintiff indicated before the motion for summary judgment was filed that Plaintiff would not pursue the federal False Arrest claim or the common law claims.  Only malicious prosecution under Section 1983 remains.

Plaintiff agrees with Defendant's recitation of the burden of proof regarding the remaining malicious prosecution claim pursued under § 1983 insofar as it correctly identifies that Plaintiff is required to show prima facie evidence that creates genuine issues of material factual dispute regarding each element of the cause of action. As the nonmoving party, Plaintiff's factual allegations should be construed in favor of the Plaintiff for the purposes of Defendant's motion for summary judgment. Plaintiff objects to and challenges Defendants' recitation of undisputed facts.

2.     <u>Elements challenged by Defendant</u>

Defendant's appear challenge two of the five elements and other facets of Plaintiff's claim for Malicious Prosecution in violation of Plaintiff's Fourth Amendment Rights under § 1983, including Plaintiff's assertion that (1) Plaintiff's malicious prosecution claim implicates the protections provided under the Fourteenth Amendment; (2) no probable cause supported the original arrest, continued confinement, or prosecution; (3) the defendants acted with malice; and (4) Defendant Officers are not entitled to Qualified Immunity.

3.     <u>Element 1</u>

Plaintiff confesses that Tenth Circuit case law does not support a claim for malicious prosecution under the Fourteenth Amendment . Plaintiff pursues his § 1983 claim for malicious prosecution under the Fourth Amendment.

4.     <u>Element 2</u>

The Tenth Circuit "takes the common law elements of malicious prosecution as the "starting point" for the analysis of a § 1983 malicious prosecution claim, but always reaches the

ultimate question, which it must, of whether the plaintiff has proven a constitutional violation. Following Albright, in the § 1983 malicious prosecution context, that constitutional right is the Fourth Amendment's right to be free from unreasonable seizures." *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996)(footnote omitted); *Pierce v. Gilchrist*, 359 F.3d 1279, 1285-86 (10th Cir.2004); *Novitsky v. City of Aurora*, 491 F.3d 1244, 1257-58 (10th Cir.2007) (citing *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir.1996)).

To establish a § 1983 malicious prosecution claim, Plaintiff must offer evidence of the following elements: (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Wilkins v. DeReyes*, 528 F.3d 790 (10th Cir.2008), cert. denied, --- U.S. ----, 129 S.Ct. 1526 (2009).

**Defendant Officers' false and misleading statements of material facts influenced the district attorney's decision to prosecute.**

The Tenth Circuit recognizes that a malicious prosecution depriving the plaintiff of rights under the Fourth Amendment is cognizable as a § 1983 action when defendants purposefully conceal and misrepresent material facts to the district attorney that influenced the prosecutor's decision to prosecute the plaintiff. *Pierce v. Gilchrist*, 359 F.3d 1279, 1292 (10th Cir.2004); *Barton v. City & County of Denver*, 432 F. Supp. 2d 1178, 1207 (D. Colo. 2006) aff'd, 06-1536, 2007 WL 3104909 (10th Cir. Oct. 24, 2007); *Taylor*, 82 F.3d at 1563-64 (citing *Reed*, 77 F.3d at 1054); *Robinson v. Maruffi*, 895 F.2d 649, 655 (10th Cir. 1990).

It is Plaintiff Heaney's theory in this case that Defendant Officers conspired to procure groundless charges based upon fabricated evidence or false, distorted, perjured testimony presented in their police reports and during the criminal case of Mr. Heaney in order to maliciously bring about Heaney's trial or conviction. *Anthony v. Baker*, 767 F.2d 657, 662 (10th Cir.1985); *See Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir.1988) (jury found that police officers' concealment and misrepresentation of material facts to the prosecutor was a likely factor in the prosecutor's choice to charge the plaintiff with murder).

Detectives Cordova, Costigan, and Ikeda submitted police reports in support of the charging and prosecution of Mr. Heaney. Detectives Ikeda and Cordova testified at the Preliminary Hearing in Plaintiff Heaney's criminal case. Detectives Ikeda, Cordova, and Costigan and Sgt. Steele testified during the motions hearing in Plaintiff Heaney's criminal case.

The affidavit in support of Mr. Heaney's arrest without a warrant was written by an officer, Detective Herrick, who was not on the scene during the incident and is not a defendant. However, the affidavit reflects the independent police reports and accounts of Defendant Officers. More fundamentally, it is besides the point which officer formally initiated the criminal prosecution. In *Pierce v. Gilchrist*, the Tenth Circuit held-on a motion to dismiss-that a forensic chemist could be an "initiator" by allegedly fabricating evidence and omitted exculpatory evidence. See id. In so holding, the Tenth Circuit explained: "Congress was concerned not just with the officer who formally initiates the process that leads to an unconstitutional seizure, but to all those who were the 'cause' of deprivations of constitutional rights." Id. at 1292; *Zamora v. City of Belen*, 383 F. Supp. 2d 1315, 1333 (D.N.M. 2005).

Therefore, Defendant Officers' written statements and oral testimony under oath can be found to have caused Plaintiff Heaney's continued prosecution.

Detective Cordova, Costigan, Ikeda, and Steele's reports and statements under oath were intended to support the second-degree assault and the mischief charges. Exhibit 7. 9:15; 183:3-10 (only Cordova found his glasses on the ground). The remaining Defendant Officers' reports and statements under oath supported the second degree assault against a police officer claim. Plaintiff's Police Policies and Procedures Expert will opine, based on thirty-six years of operational experienced, include a command position in Thornton, Colorado, that he finds extensive misrepresentation in Defendant Officers' reports. Exhibit 21, p.2.

Plaintiff Heaney avers that Officers Cordova, Costigan, Ikeda, and Steele made the following false or misleading statements in police reports and testimony under oath at the Preliminary Hearing and Motions Hearings in support of Heaney's criminal citation and prosecution, *before they knew about the existence of the video* (Defendants' Exhibit 11, Schott Video, fourth segment):

    a.  Cordova and Costigan falsely claim that Heaney dropped the bike and marched toward them. Cordova claims that Heaney dropped his bike 10-30 feet away then walked aggressively toward Cordova who was awkwardly attempting to identify himself as a officer with his badge attached to his belt under his shirt. Exhibit 14, 40:25; 62:14-63:17. Cordova also testifies that after Heaney punches him, Cordova backed up and Heaney continued to come forward. Exhibit 14, 47:4. This would have put Cordova and Heaney even farther away from Heaney's bike.

Costigan says Heaney dropped his bike 5 feet away and walked aggressively toward Cordova. Exhibit 15, 60:8-12. Heaney testified that he was strattling the bike when he was knocked off by the two officers. Exhibit 6, 169-170; Exhibit 2, 233-234. Ikeda says Heaney dropped the bike before he punched Heaney. Exhibit 1, 16:11; 35;9-13. Ikeda in motions says that the bike was a couple of feet away from Cordova. Exhibit 16, 44:1-2. The video clearly shows that Heaney is laying on top of the bike while Cordova and Costigan are beating him. Defendants' Exhibit 11, Schott Video, fourth segment (the unaltered video/audio recording). However, the bike is moved away by someone during the video footage. Defense Exhibit 11, Schott video. Palmatier states that the bike was 10, not 30, feet from them during the struggle. Exhibit 17, 34:1-7. Palmatier arrived after Heaney, Cordova, and Costigan were on the ground. It appears that the bike was 10 feet away *after* Heaney was taken down. So, Cordova and Costigan dissemble by testifying that the actual location of the bike after the incident is the location where they claim falsely that Heaney dropped his bike before he allegedly marched toward the officers.

b. Cordova, Costigan, and Ikeda falsely claim that Cordova repeatedly identified himself. Neither Heaney nor a third party witnesses saw or heard that. Exhibit 14, 42:24; Exhibit 4; Exhibit 5; Exhibit 9; Exhibit 11. Heaney denies that Cordova or any officer identified themself before Heaney was being beaten. Exhibit 6.

c. Cordova and Costigan falsely claim that they took Heaney down because he punched Cordova and was swinging wildly and Cordova was responding with

punches like a boxing match.[4] Exhibit 14, 43, 46:21-47:19; Exhibit 15, 64:1-18.
Heaney and independent witnesses deny that he punched Cordova. Instead,
Heaney and third party witnesses say that the officers pulled Heaney off the bike.
No third party witnesses confirm that Cordova punches back or that Cordova and
Heaney engage in a boxing match. Cordova and Costigan testify that Cordova
and Costigan dragged Heaney to the ground. Exhibit 14, 47:19-48. In direct
contradiction to Cordova, Ikeda and other officers state (falsely) that they saw
Heaney punch Cordova once. Exhibit 1, 6:14; Exhibit 18,. 51:1-9; 76:9-17. Ikeda
and others testify that Cordova did not strike back before Heaney was taken down
to the ground by Cordova and Costigan. Exhibit 1, 20:8.

d. Cordova, who was allegedly punched, falsely testifies that Heaney used his left
hand. Exhibit 14, 43. Costigan falsely testified that it was Heaney's right fist.
Exhibit 15, 61:6. Heaney testified that he reached up with his bent left arm and
the open palm of his left hand, and that he didn't punch Cordova.

e. Cordova falsely testifies that his ball cap and glasses immediately fell off when
his head swung back due to being punched. Exhibit 14, 44:12. This testimony is
the entire basis for the mischief charge. However, the video and other testimony
describe several violent acts by Cordova himself. There are several opportunities
for Cordova's hat and glasses to have fallen to the ground or been broken due to
his own unlawful conduct. See Defendants' Exhibit 11, Schott video, fourth

---

4 Cordova is trying to justify the Cordova's later punches after Heaney was taken off his bike and taken to the
ground by conflating that period with the period when Heaney allegedly punched Cordova, which would justify
punching by Cordova. This is a basic defense strategy in this case.

segment.  Even if Cordova reacted to Heaney's reaching toward his cap, the

reaction would not have been to a punch.  That is precisely the type of kernel of

truth upon which knowingly false statements can be made.

 f. <u>Ikeda describes Heaney on hands and knees after Heaney was knocked to the</u>

  <u>ground. Exhibit 1, 26:15-23.  Cordova identifies the same point in the incident,</u>

  <u>testifying that Heaney was "on all fours" when Cordova and Costigan took</u>

  <u>Heaney to the ground.  Cordova PH 70.  The video footage of the incident starts at</u>

  <u>the moment described here, when Heaney was taken to the ground, landing on his</u>

  <u>hands and knees.  Defendants' Exhibit 11, Schott Video, fourth segment.  Jason</u>

  <u>Jewett, who started the video camera while he was working for Prinkey, agrees</u>

  <u>that the moment immediately after Heaney was taken off the bike was captured at</u>

  <u>the beginning of the video "immediately" after Jewett turned the camera on.</u>

  Exhibit 5, para. 6 through para. 16.[5]

 g. Defendant Officers' false allegations that Heaney actively resisted are

  contradicted by the video taken by Jason Jewett and Mr. Prinkey.[6]  Defendants'

  Exhibit 11, fourth segment. Cordova and Costigan attempt to use this false

---

5 This consistent set of testimony from officers and a third party witness are essential to understanding the case and the arguments on summary judgment.  The video in real time and without modification shows three officers in complete control over Heaney.   There are clear instances when the officers are engaged in excessive force.  The defense must freeze frame the video to fish for instances that can be interpreted as resistive.  They allege that they find five. While those allegations strain common sense, Cordova and Costigan and the defense found a way to work around the video by claiming that there was a long period of time when Heaney was resisting *before* the video footage starts.  But, as the videographer Mr. Jewett states, Heaney was on his hands and knees (as seen at the beginning of the video footage) in a "matter of seconds" after Heaney was taken off the bike. That is when Jewett "immediately started filming." Jewett Aff. para. 6, 12, and 13; Defendants' Exhibit 11, Schott Video, fourth segment.   Therefore, there is no gap in time – not to mention an extensive gap in time as defendants' allege – between the take down and the beginning of the video footage when Heaney is purportedly engaged in excessive force not seen on the video.
6 The video shows no active resistance and presents, at most, a dispute about non-compliance early on.

allegation to justify punches and knee strikes to Heaney's head, as well as other instances of excessive force (see the list of six instances of excessive force above).[7]  Exhibit 14, 56:18-57:14. Defendants' Exhibit 11, Schott Video, fourth segment. Heaney testifies that he never fought back.  Cordova and Costigan describe a series of aggressive and resistive actions by Heaney that they suggest occurred before the video starts to record.  Exhibit 14, 48:24 (getting up on his feet); Exhibit 14, 49:5 (swing and punch); Exhibit 14, 49:21 (Heaney punched Cordova in the chest when on the ground); Exhibit 14, 56:3 (resisting until the point when he has his arms behind his back); Exhibit 15, 62:15. At the time of their statement Cordova and Costigan were unaware that there was video footage. They were also unaware that Jewett would testify that the video starts immediately after the beginning of the take town. Ikeda says Heaney was actively resisting, but changes his testimony in a subsequent hearing to passively resisting (both hearings were before the video surfaced).  Exhibit 1, 25:15-23; Exhibit 18, 84. Ikeda also testifies that Palmatier was clearly going to tackle Cordova, Costigan, or himself --- indicating that Palmatier did not perceive Heaney as the aggressor but as the victim in what Palmatier initially believed was a dispute among civilians.  Exhibit 16, 86; Exhibit 17, 20:24.  Palmatier testifies that he never saw Heaney strike Cordova.  Exhibit 17, 33:9-11.

h. Before Defendant Officers were aware there was video evidence, they all claimed *not* to have seen heard the head slam.  Cordova falsely claims that there was

---

7 The defense imagines a justification for their Constitutional violations by (a) using freeze-frame images from the video that defy common sense and (b) manufacturing an imaginary gap in time filled with alleged resistive acts.

"absolutely not" a time when someone slammed Heaney's face into the ground. Exhibit 14, 57:14. Cordova omits from his use of force and police reports any reference to the head slam. Defendants Exhibit 11, fourth segment. But it's clear on the video that Cordova was the moving force of the head slam. *Id.* Ikeda claims he neither saw nor heard Heaney's head hit the street (or hear a similar sound). Exhibit 1, 34:10-14. Ikeda testifies that he was focused away from the incident. Exhibit 1, 33:25. Yet the video shows that Ikeda is standing above and near Heaney. Defendants' Exhibit 11. Also, Ikeda reverses his testimony from the Preliminary Hearing to the Motions Hearing, where he testifies that he was closely observing what was going on at the point that the cuffs were going on, which is when the head slam occurred in the video.[8] Exhibit 16, 47:21. Palmatier claimed that he didn't hear a loud cracking noise or unusual noise and he didn't see the head slam. Exhibit 17, 34:1-7; 36:17-18. Costigan claims that he didn't see anyone slam Heaney's face into the ground, and he didn't hear an acute breaking noise. Exhibit 15, 66:5-8. All Defendant Officers are next to Heaney when his head smashes into the street and a loud noise is heard by witnesses and recorded on the audio/video by Jewett. Defendants' Exhibit 11. Sergeant Steele was told by Heaney that an officer slammed Heaney's head into the ground, but Steele didn't follow up. Exhibit 19, 16:1-3.

---

8 Ikeda get's it wrong who was putting the cuffs on Heaney.

The above-referenced false statements each had material impacts on the finding of probable cause, the charging and arrest of Mr. Heaney, and the continued prosecution of Mr. Heaney. It may be inferred by other supporting facts and circumstances that they were knowing false statements.

**Plaintiff Heaney claims malicious prosecution against Defendant Officers for the charges pursued during the criminal prosecution of Heaney, not the charges that might have formed the basis of the initial contact between the undercover officers and Mr. Heaney.**

There is a dispute about how and why the initial contact between Heaney and Cordova occurred. This debate, however, is irrelevant to this motion for summary judgment. As stated, Plaintiff does not pursue a false arrest or false imprisonment claim, making irrelevant on summary judgment any dispute regarding the alleged traffic infraction at the start of the incident or any allegations of disturbing the peace or other charges relating to the verbal altercation between Heaney and Cordova. However, it is important to distinguish that the charges in Heaney criminal case, second degree assault and mischief, were not the basis for the initial contact with Heaney. Further, the relevant probable cause determination for the malicious prosecution claim is that relating the charges against which Heaney defended in the District Court prosecution initiated and supported by Defendant Officers.

A party can challenge prosecutions on a charge by charge basis. *Miller v. Spiers*, 339 F. App'x. 862, 867-68 (10th Cir. 2009). In *Elbrader v. Blevins*, the Kansas District Court considered whether a conviction on one charge and a dismissal of other charges precluded a subsequent malicious prosecution claim. *Elbrader v. Blevins*, 757 F.Supp. 1174, 1179-80 (D.Kan. 1991). The Kansas District Court determined that plaintiff's conviction for obstructing legal process did not bar a subsequent malicious prosecution claim based on resisting arrest and

disorderly conduct charges that were later dismissed, where the persons bringing the charges were police officers rather than lay persons, and the charges involved arguably different conduct. Id. at 1179-80. *The Kansas District Court Lyons v. Shead*, found that the circumstances in Elbrader were similar to *Janetka v. Dabe* and a line of cases arising from New York. *Lyons v. Shead*, 90-4090-R, 1992 WL 363614 (D. Kan. Nov. 17, 1992). In *Janetka v. Dabe*, the plaintiff was yelling and pointing his finger at another man when he was told by the defendant police officer that he might be arrested. Plaintiff responded with expletives and was then arrested for disorderly conduct. *Janetka v. Dabe*, 892 F.2d 187 (2d Cir.1989). Plaintiff allegedly struggled with the police and was charged with resisting arrest. At the trial on criminal charges, plaintiff was found guilty of disorderly conduct but innocent of resisting arrest. Plaintiff brought a malicious prosecution action which the district court dismissed on the grounds of the conviction for disorderly conduct. The Second Circuit reversed this decision noting that plaintiff had been charged with two distinct offenses involving distinct allegations, in that case actions directed at different people and neither charge was a lesser included offense of the other. In Janetka, the Second Circuit held that plaintiff's acquittal of a resisting arrest charge was a favorable termination for the purposes of his malicious prosecution claim even though plaintiff was convicted of a lesser, related charge. 892 F.2d at 190. See also, *Graebe v. Falcetta*, 726 F.Supp. 36 (E.D.N.Y.1989) (conviction for speeding does not bar malicious prosecution action stemming from acquittal on charges of resisting arrest and attempted escape); *Katz v. Morgenthau*, 709 F.Supp. 1219, 1232 n. 3 (S.D.N.Y.1989) (plaintiff brings malicious prosecution action stemming from acquittal on misdemeanor coercion charges even though plaintiff was convicted of aggravated harassment); but see, *Goree v. Gunning*, 738 F.Supp. 79 (E.D.N.Y.1990) (convictions

for resisting arrest, disorderly conduct and harassment bar malicious prosecution claim based on acquittal on charges of possession of a weapon and menacing).

Plaintiff Heaney was prosecuted in Denver District Court for felony Second Degree Assault Against a Police Officer in relation to allegedly punching Detective Cordova in the nose and misdemeanor mischief in relation to the alleged destruction of Detective Cordova's sunglasses. The initial contact with Mr. Heaney apparently did not raise probable cause for an arrest. Any charge that could feasibly have formed the basis of the initial contact with Heaney was not prosecuted, although Defense might allege that it formed the basis for the arrest. Either way, the reason for the initial contact between Plaintiff Cordova and Defendant Cordova are distinct. One preceded the other. They were based on different actions that were unrelated in terms of the elemental bases for actual or potential criminal citations.

**A reasonable jury, approaching the disputed material facts in the light most favorable to Plaintiff, could find that Defendants' conduct denied Heaney his constitutional right to a proper probable cause determination on the second degree assault charge and the mischief charge.**

"Probable cause for an arrest warrant is established by demonstrating a substantial probability that a crime has been committed and that a specific individual committed the crime." *Wilkins v. DeReyes*, 528 F.3d 790, 801-02 (10th Cir. 2008); *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir.1996); Whether there was probable cause to arrest and prosecute is a jury question. In *DeLoach v. Bevers*, the Tenth Circuit stated: "We have long recognized that it is a jury question

in a civil rights suit whether an officer had probable cause to arrest." *DeLoach v. Bevers*, 922

F.2d 618, 623 (10th Cir., 12/31/90, slip op. at 11).

The Tenth Circuit provides guidance on how to determine whether there was an absence

of probable cause when law enforcement officials communicated false statements to prosecutors

in support of a probable cause determination:

> "It is a violation of the Fourth Amendment for an arrest warrant affiant to "knowingly, or
> with reckless disregard for the truth,' include false statements in the affidavit." Id.
> (quoting *Franks v. Delaware*, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 2676-77, 57 L.Ed.2d
> 667 (1978)). Similarly, it is a Fourth Amendment violation to "knowingly or recklessly
> omit from the affidavit information which, if included, would have vitiated probable
> cause." Id. (citing *Stewart v. Donges*, 915 F.2d 572, 581-83 (10th Cir.1990)). If an arrest
> warrant affidavit contains false statements, "the existence of probable cause is determined
> by setting aside the false information and reviewing the remaining contents of the
> affidavit." Id. Where information has been omitted from an affidavit, we determine the
> existence of probable cause " 'by examining the affidavit as if the omitted information
> had been included and inquiring if the affidavit would still have given rise to probable
> cause for the warrant.' " Id. (quoting Stewart, 915 F.2d at 582 n. 13).

*Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996).

The Tenth Circuit, however, has also stated that:

> A prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision
> not to drop charges but to proceed to trial-none of these decisions will shield a police
> officer who deliberately supplied misleading information that influenced the decision ....
> If police officers have been instrumental in the plaintiff's continued confinement or
> prosecution, they cannot escape liability by pointing to the decisions of prosecutors or
> grand jurors, or magistrates to confine or prosecute him. They cannot hide behind the
> officials whom they have defrauded.

*Pierce v. Gilchrist*, 359 F.3d 1279, 1292 (10th Cir.2004)(quoting *Jones v. City of Chicago*, 856

F.2d 985, 994 (7th Cir.1988)(emphasis in original)).

In *Robinson v. Maruffi*, police officers, who purposefully concealed and misrepresented

material facts to the district attorney, appealed a jury conviction for conspiracy for malicious

prosecution. *Robinson v. Maruffi*, 895 F.2d 649 (10th Cir. 1990).  The Tenth Circuit rejected as

"disingenuous" police officers' "argument that their misconduct is shielded by the acts of the prosecutor, the grand jury, and the trial and appellate courts ...." 895 F.2d at 655-56. The Tenth Circuit held that the plaintiff presented sufficient evidence upon which the jury could find that the defendants' conduct defiled the investigation, the grand jury proceedings and trial, and was so outrageous as to deny Robinson his constitutional right to a proper probable cause determination. *Robinson v. Maruffi*, 895 F.2d 649, 657 (10th Cir. 1990), citing *Anthony v. Baker*, 767 F.2d 657, 663 (10th Cir. 1985)(rejecting defendants' argument that probable cause had already been determined under state court proceedings, thus making a new determination inappropriate).

As stated above, Plaintiff asserts that Defendant Officers submitted false reports and made false and misleading statements during criminal hearings. The allegations of false and misleading statements raised above implicate the material elements of second degree assault and mischief under the circumstances of this case. The extent of contradictions among the officers and between their representation and the video raise the question whether the prosecution was relying on fraudulent allegations. There are several material contradictions pointed out above among the officers' reports and statements, before the video and third party witnesses surfaced. There are also several material contradictions pointed out above between the officers' reports and statements and the subsequently obtained video, photographs, and third-party witness statements.

There is additional evidence that raises a genuine issue of material fact whether any finding of probable cause permitting the criminal prosecution of Mr. Heaney to proceed was based on omitted statements, in additional to false and misleading statements. There are material omissions in Defendant Cordova's reports. Defendant Cordova's report mentions nothing about

Heaney's broken teeth. Cordova Incident Report. Cordova claims that he didn't see Heaney's broken teeth. Exhibit 7,. 182:23-183; photo). At the same time there is no mention of an injury to Cordova's nose in his incident report. Exhibit 7, 174:21-25; Cordova Incident Report.

The undisputed facts and disputed facts taken in the light most favorable to Plaintiff show that Cordova testified that he was angered that someone in the cross-walk made contact with him causing some pain to his elbow. Cordova believed that he had been "assaulted." Cordova believed it was Heaney because he looked up and saw Heaney riding a bike across the intersection. Cordova was angry enough to compromise the scalping mission, redirecting his attention away from the nearby targets of the undercover operation, and involve his fellow officers in a dispute with a person who was not a threat and who was unrelated to their mission. However, Cordova testifies that he didn't intend to arrest D for a traffic offense, but merely wanted an apology. Cordova screams at P to turn around and Heaney complies out of curiosity. Cordova then berates the defendant. P admits that, in fear because he was being berated by an aggressive civilian, he reached up to knock off Cordova's hat to create a diversion and escape.

There is a genuine issue of material fact regarding the question of how the altercation started. It is Plaintiff's position that Cordova fabricated his story first espoused at the Preliminary Hearing in Heaney's criminal case that Heaney punched Cordova in the nose and they engaged in a boxing in the middle of the Market and 20th Street intersection. Cordova claims, before third-party witnesses surfaced, that after Heaney punched him in the nose Heaney and Cordova then exchanged punches several times. However, Cordova's fellow officers, Heaney, and the third party witnesses contradict Cordova's account of a boxing match. Their testimony reflects

only one motion by Heaney and an immediate take down by Cordova and Costigan. At the beginning of the video Cordova can be seen on top of Heaney who is on all fours. Cordova is pummeling Heaney in the head and torso. It's Plaintiff's position that Cordova sought to fabricate the boxing match story to make more palpable his out of control battery of Heaney after Costigan and he took Heaney down off his bike. Cordova believed a boxing match between Heaney and Cordova could be justified, whereas the pummeling of Heaney at the beginning of the video cannot be justified. At the time of this testimony, Cordova was unaware of the existence of the video. A reasonable jury could find that any probable cause for second degree assault and mischief were based on a fraud.

It is undisputed that after Cordova and Costigan took Heaney to the ground they began a 1 ½ minute pummeling that lasted at least 1 ½ minutes (the length of time of the video), including kicks to Heaney's torso and punches to Heaney's head. It is Plaintiff's position that this would be an admission of any motion for summary judgment filed by Plaintiff on the issue of excessive force, but that it at least forms a genuine issue of material fact that there was a deprivation of Heaney's civil rights related to, in violation of (because it describes punching soft tissue for pain compliance), and caused by (because it permits that level of violence) Denver's unconstitutional policy permitting punching and kicking a subject who passively resists.

There are issues of material fact whether Cordova placed Heaney in a carotid choke hold, whether Cordova slammed Heaney's head into the street while Cordova held Heaney's pony tail, and whether Cordova torturously pulled Heaney's hair up while Cordova's knee pinned Heaney's neck into the street.

Sgt. Steele coordinated the effort to support the second degree assault charge and the mischief charge by pulling his supervisees aside, coordinating false reports, the warrantless arrest affidavit written by an officer who wasn't present and relied on the Defendants' accounts, and use of force reports, as well as the account of Heaney's statements and the Use of Force cover sheet written by Steele himself.

Once the video surfaced and it was clear that Cordova's allegations of a boxing match were uncorroborated if not contradicted by witness accounts, it was necessary for the defense to develop new cynical theories to justify the long series of excessive uses of force on the video. This theory of justification has two primary components: 1) Cordova alleges that the physical altercation with Heaney occurred for a long time before the video started and went through several distinct phases before the video started to record the incident, and 2) Cordova and other officers point to four or five distinct incidents on the video which they allege to constitute resistance justifying the use of force. None of Heaney's alleged specific acts of resistance, allegedly visible on the video, were described before the video was seen by the defense. The alleged incidents of resistance are highly questionable in their own right. A reasonable jury could infer from these circumstances that the defense developed some theories and the officers conformed their testimony to those theories through false testimony during the Internal Affairs investigation, the criminal trial of Cordova, and depositions in this civil action.

5.     Element 3

**Malice is found in the ulterior motive for Defendants' support of Heaney's prosecution, which was the conspiracy to cover-up Defendant Officers' excessive force and failure to**

44

**intervene by deliberately manufacturing the bases for criminal charges against Mr. Heaney.**

The Tenth Circuit has held that malice is a jury issue which can be inferred from absence of probably cause. _Barton v. City & County of Denver_, 432 F. Supp. 2d 1178, 1208 (D. Colo. 2006) aff's, 06-1536, 2007 WL 3104909 (10th Cir. Oct. 24, 2007).

The officer's were part of the training Vice Team 50. It can be inferred that they were acting to protect their comrades and themselves from administrative discipline or civil liability for violations of Plaintiff's civil rights. Before the video and the third-party witnesses surfaced, Ikeda, Costigan, and Steele felt they could justify the force used (and the failure to intervene). They stuck to the line that Heaney initiated the fight when he punched Cordova in the nose without instigation and that Heaney resisted actively while being detained.

Cordova and fellow officer's then conspired to draft and file false reports and testify falsely under oath during  PH and Motions Hearing in order to support the cover charges of second degree assault against a police officer and mischief.  Justification of Cordova and Costing's excessive use of force and Ikeda's failure to intervene was the ulterior motive to initiate and support a prosecution against Heaney for the criminal charges.

See Conspiracy analysis below.

6.      Element 4

**Defendant Officers are not entitled to Qualified Immunity when they relied on false statements (fabricated evidence) to support the prosecutor's probable cause finding leading to an ongoing prosecution.**

With respect to Defendants' qualified immunity defense, the question is whether the law regarding the alleged constitutional violation was clearly established. If it was not, qualified immunity applies.

The constitutional right that Plaintiff alleges were violated was clearly established if the "contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. "For the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must be as plaintiff maintains." *Foote v. Spiegel*, 118 F.3d 1416, 1424 (10th Cir.1997). "[T]he salient question ... is whether the state of the law [at the time of the conduct] gave [Defendants] fair warning that their alleged treatment of [Plaintiffs] was unconstitutional." Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

It is clearly established that false evidence cannot contribute to a finding of probable cause. Probable cause depends on "reasonably trustworthy information." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). The Supreme Court has held it is a violation of the Fourth Amendment to " 'knowingly, or with reckless disregard for the truth,' include false

statements in the affidavit" outlining probable cause for an arrest. *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir.1996) (quoting *Franks v. Delaware*, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)); accord Stewart v. Donges, 915 F.2d 572, 581-82 (10th Cir.1990).

Where false statements have been relied on to establish probable cause, "the existence of probable cause [for § 1983 purposes] is determined by setting aside the false information." Wolford, 78 F.3d at 489; accord Pierce, 359 F.3d at 1294-95. If Plaintiffs' allegations are true the officers obviously could not rely on fabricated evidence in evaluating whether probable cause existed to arrest and prosecute Plaintiff. If the evidence is viewed in the light most favorable to Plaintiff, the non-moving party, then Plaintiff has provided sufficient evidence that a reasonable jury could find that without the false and misleading statements and material omission, the officers lacked probable cause.

It is also clearly established that knowingly arresting a defendant without probable cause, leading to the defendant's subsequent confinement and prosecution, violates the Fourth Amendment's proscription against unreasonable searches and seizures. *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); Meacham, 82 F.3d at 1561 (holding one constitutional right protected by § 1983 malicious prosecution claims "is the Fourth Amendment's right to be free from unreasonable seizures"); *Wilkins v. DeReyes*, 528 F.3d 790, 804-06 (10th Cir. 2008). Plaintiff has presented facts that, if true, constitute a violation of the Fourth Amendment. Without the allegedly false and misleading statements and omissions, the officers did not present information from which a detached magistrate could conclude probable cause existed to justify continued detention. Under the version of facts presented by Plaintiff the Defendant Officers fabricated evidence to cover up police misconduct by framing Heaney for

second degree assault against a police officer and mischief, and a reasonable officer should have known no probable cause existed without their false and misleading statements and omissions. Defendant officers are therefore not entitled to qualified immunity on the malicious prosecution claim.

**F. Conspiracy**

1. Burden of Proof

Plaintiff has the burden of proof regarding the Plaintiff's conspiracy claim pursued under § 1983. Plaintiff is required to show prima facie evidence that creates genuine issues of material factual dispute regarding each element of the cause of action. As the nonmoving party, Plaintiff's factual allegations should be construed in favor of the Plaintiff for the purposes of determining whether there are genuine issues of material fact requiring denial of Defendant's motion for summary judgment. Plaintiff objects to and contests Defendants' recitation of undisputed facts.

2. Elements challenged by Defendant

Defendants challenge the following remaining elements of Plaintiff's Conspiracy claim under § 1983, including Plaintiff's assertion that (1) evidence exists of a constitutional violation; (2) evidence is sufficient to establish concerted action directed toward the violate Plaintiff's rights by maliciously prosecuting Plaintiff as a criminal defendant; (3) and evidence is sufficient to establish a conspiratorial objective meeting of the minds to use maliciously prosecute Plaintiff as a criminal defendant.

3. Element 1

Plaintiff refers to the above arguments regarding violations of his Fourth Amendment rights when Defendants maliciously prosecuted him in Denver District Court. Existence of the conspiracy reinforces the claims against each Defendant Officer by demonstrating how the false statements at the basis of the malicious prosecution were coordinated.

4.    Element 2 and Element 3

A conspiracy may form the basis of a § 1983 claim when a plaintiff alleges specific facts showing an agreement and concerted action amongst the defendants. *Tonkovich v. Kan*. Bd. of Regents, 159 F.3d 504, 533 (10th Cir.1998) (quoting *Hunt v. Bennett*, 17 F.3d 1263, 1266 (10th Cir.1994)). A § 1983 conspiracy action requires at least a combination of two or more persons acting in concert and an allegation of a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective. *Snell v. Tunnell*, 920 F.2d 673, 702 (10th Cir.1990); *Brooks v. Gaenzle*, 614 F.3d 1213, 1227-28 (10th Cir. 2010) cert. denied, 10-621, 2011 WL 197663 (U.S. Jan. 24, 2011). Parallel action is not enough; but an express agreement is not necessary. See *Bell Atl. Corp.,* 127 S.Ct. at 1966 ("Without more, parallel conduct does not suggest conspiracy...."); See Hunt v. Bennett, 17 F.3d 1263, 1268 (10th Cir.1994); Snell v. Tunnell, 920 F.2d 673, 702 (10th Cir.1990); *Wilson v. City of Lafayette*, CIVA 07CV01844EWNKLM, 2008 WL 4197742 (D. Colo. Sept. 10, 2008).

In order to prove a § 1983 conspiracy claim, a plaintiff must show that the defendants conspired to deprive him or her of a constitutional right or a federally protected right under color of state law. *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 n. 6 (10th Cir.1990). In addition to proving the conspiracy, plaintiff must also prove an actual deprivation of a constitutional right.

Id. at 1449; *Snell v. Tunnell*, 920 F.2d 673, 701 (10th Cir.1990). Moreover, "[c]onclusory allegations of conspiracy are insufficient to state a valid § 1983 claim." *Hunt v. Bennett*, 17 F.3d 1263, 1266 (10th Cir.1994); *Twitchell v. Hutton*, 10-CV-01939-WYD-KMT, 2011 WL 318827 (D. Colo. Jan. 28, 2011).

Provided that there is an underlying constitutional deprivation, the conspiracy claim allows for imputed liability; a plaintiff may be able to impose liability on one defendant for the actions of another performed in the course of the conspiracy. *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 n. 6 (10th Cir.1990).

The Tenth Circuit has not defined "conspiracy" for the purposes of a section 1983 conspiracy claim. However, abstracting from existing law, District Court Judge Nottingham of the United States District Court for the District of Colorado determined that a conspiracy essentially consists of (1) two or more persons; (2) agreeing or acting in concert; (3) for an unlawful purpose or by unlawful means; and (4) committing an overt act toward the completion of the conspiracy's objective. See Dillard-Crowe, 2008 WL 3201226, at *8; see also Black's Law Dictionary 329 (8th ed.2004) (defining conspiracy as "[a]n agreement by two or more persons to commit an unlawful act, coupled with an intent to achieve the agreement's objective, and [in most states] action or conduct that furthers the agreement"); *Wilson v. City of Lafayette*, CIVA 07CV01844EWNKLM, 2008 WL 4197742 (D. Colo. Sept. 10, 2008).

In support of Plaintiff's conspiracy claim under § 1983, there are four factual elements that contribute to Plaintiff's proof of concerted action, which are directed toward the common objective of justifying and covering up the use of force and failure to intervene by framing

Plaintiff for the criminal charges of second degree assault and mischief: 1) the lies that can be inferred from false statements above, 2) the existence of shared lies among Defendant Officers, 3) the opportunity to collaborate and the process of coordination, and 4) the existence of a leader or organizer, Sergeant Steele.

The false statement in the malicious prosecution analysis above all had material impacts on the finding of probable cause, the charging and arrest of Mr. Heaney, and the continued prosecution of Mr. Heaney.  It may be inferred by other supporting facts and circumstances that they were knowing false statements. The question relating to the conspiracy is how they took form.

The language used by Defendant Officers is similar as their narrative was inappropriately developed in concert.  They use identical language like: 1) Heaney "sideswiped" Cordova with his bike, and 2) Heaney was "swinging wildly" on the ground. Officers are not supposed to consult when drafting their reports, except on basic data like location and names, although shockingly the City and County of Denver lacks a policy regarding the drafting of use of force reports.  Exhibit 23.

Defendant Costigan's criminal report was a reduced version, word for word, of his use of force report.  It cuts off a few paragraphs.  The account of Heaney's alleged criminal acts was written with the justification of police use of force foremost in his mind.  In other words, he determined the justification for Cordova and his own actions and worked backwards to his allegations about Heaney's criminal conduct.   Exhibit 20, 117-126

Defendant officers had a clear opportunity to form a conspiracy to cover up their actions and omissions by framing Heaney.  There is no policy prohibiting Denver police officers from

collaborating before and during the drafting of use of force, or other, reports. Exhibit 22 at 151-152. Cordova, Costigan, and Ikeda spoke with one another and with Sgt. Steele about the use of force during the six hours following the incident before their reports were submitted. Exhibit 7, 161-170; 175:5-15; 175-179:10; 184:2-19. Cordova spoke with Steele at the hospital. Costigan and Ikeda went from Headquarters to DHMC where they saw Cordova. Then they had a further opportunity to discuss their reports when Steele drove Cordova to the clinic and then Headquarters. Cordova spoke with Costigan *about* writing his report. Exhibit 20, 126; 136-139; Exhibit 7, 176:10-16. Steele took Costigan and Ikeda back to Headquarters and advised them that Heaney's teeth were knocked out. Cordova also came back to HQ, and Costigan "compiled information" for the use of force report in "collaboration" with Cordova and others but the reports were written separately. Costigan says that he also spoke with Steele and Ikeda before writing his report. The police reports were written at 13:45, and use of force written later at about 16:30 which is the same time as Costigan and Cordova's reports. Exhibit 18, 12-15.

Sgt. Steele is the supervisor of the three other Vice officers. Sergeant Steele drives the officers around after the incident and discussed their use of force reports before they were drafted and submitted. It is Plaintiff's theory of conspiracy that Steele pieced together the basic theory to justify the use of force and failure to intervene. He determined the basic parameters of the event and heard his supervisees' accounts. Sgt. Steele interviewed Mr. Heaney, the criminal defendant, ostensibly for the use of force investigation, which is Steele's responsibility. Exhibit 19, 8:5; 14:16. Steele does not record the interview although it is intended for use in the case of allegations of excessive force. Exhibit 19,10:8-14. Heaney testified in his deposition that several of Steele's representations of his statements were false and intended to justify the force used by

the officers. Exhibit 6, 138:15-16. Specifically, Heaney says that Sgt. Steele was categorically incorrect when he represented that Heaney admitted to contacting Cordova when he reached up for Cordova's hat. Exhibit 6, 14:11-13. Knowing the parameters of Mr. Heaney's testimony and how he could mis-state Mr. Heaney's statements, Steele coordinated the Defendant Officers' use of force reports, and police reports for the criminal case.

There is video evidence in the Scarlett Ranch case of Steele coordinating Vice 50 Team members to tamper with evidence by obtaining and concealing video surveillance in a club in order to cover up his own excessive force. Exhibit 18, 25:9-11; 30-22-24; Scarlett Ranch Video; Exhibit 23. The video and the Denver Police Department evidence log are admissible via Fed.R.Evid. 404(b) regarding Sgt. Steele's modus operandi of tampering with evidence of police excessive force.

Exhibit Index:

Exhibit 1 – Ikeda Testimony from Heaney Criminal Preliminary Hearing
Exhibit 2 – Heaney Testimony from Cordova Criminal Trial
Exhibit 3 – Renee Herlocker  Testimony from Cordova Criminal Trial
Exhibit 4 – Greg Prinkey Affidavit
Exhibit 5 – Jason Jewett Affidavit
Exhibit 6 – Heaney Deposition
Exhibit 7 – Cordova Deposition
Exhibit 8 – Prinkey Testimony from Cordova Criminal Trial
Exhibit 9 – Prinkey Deposition
Exhibit 10 – Heckman Testimony from Cordova Criminal Trial
Exhibit 11 – Jewett Testimony from Cordova Criminal Trial
Exhibit 12 – Policy [Filed Under Seal]
Exhibit 13- Willard Report
Exhibit 14- Cordova Testimony from Heaney Preliminary Hearing
Exhibit 15- Costigan Testimony from Heaney Motions Hearing
Exhibit 16- Ikeda Testimony from Heaney Motions Hearing
Exhibit 17- Palmatier Testimony from Heaney Motions Hearing
Exhibit 18- Ikeda Deposition
Exhibit 19- Steele Deposition
Exhibit 20- Costigan Deposition

Exhibit 21 – Willard Expert Report, 6/14/10
Exhibit 22 – O'Neil Deposition
Exhibit 23 – Evidence Log from Vice Team 50 action at Scarlett Ranch
Exhibit 24 – Video from surveillance at Scarlett Ranch [conventionally submitted]
Exhibit 25 – Photos taken by Nick Heckman, relating to Exhibit 10
Exhibit 26- Cordova Incident Reports
Exhibit 27- 30(b)(6)


WHEREFORE for the following reasons, Plaintiff respectfully requests that the Court

deny Defendants' Motion for Summary Judgment and order a trial on the facts.


Respectfully submitted this 23rd day of February, 2011.

LONN HEYMANN LAW FIRM, P.C.

By:  s/ *Lonn M. Heymann*

Lonn M. Heymann
1391 Speer Blvd., Suite 550
Denver, Colorado 80204
Phone: (303) 825-2223
Fax:    (303) 825-2224

ATTORNEY FOR PLAINTIFF HEANEY

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 23rd day of February, 2011, I electronically filed the foregoing

**PLAINTIFF'S RESPONSE
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

with the Clerk of Court using the CM/ECF system, which will send notification to the following:

Jamie Dyan Wynn
jwynn@bcjlpc.com

Marc F. Colin
mcolin@bcjlpc.com

Suzanne A. Fasing
Suzanne.Fasing@denvergov.org

Wendy Shea
Wendy.Shea@denvergov.org

*s/   Lonn M. Heymann*

1.